Cite as 2023 Ark. App. 600

# ARKANSAS COURT OF APPEALS
DIVISION II
No. CV-23-447

| | |
|---|---|
| SHANNA MOON AND CHRISTOPHER MOON | Opinion Delivered December 13, 2023 |
| APPELLANTS | APPEAL FROM THE PERRY COUNTY CIRCUIT COURT [NO. 53CV-20-11] |
| V. | |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN | HONORABLE TJUANA BYRD MANNING, JUDGE |
| APPELLEES | AFFIRMED |

**WAYMOND M. BROWN, Judge**

Appellants Shanna Moon and Christopher Moon separately appeal the Perry County Circuit Court's termination of their parental rights to their four children, Minor Child 1 (MC1),[1] Minor Child 2 (MC2),[2] Minor Child 3 (MC3),[3] and Minor Child 4 (MC4).[4] Both appellants challenge the circuit court's best-interest determination, arguing that the circuit court erred when it failed to consider the impact termination would have on the sibling

---

[1]Female, born November 21, 2012.

[2]Male, born March 20, 2014.

[3]Male, born December 1, 2015.

[4]Female, born September 5, 2017.

relationship.  Shanna additionally argues that she did not pose a danger to the children and that she made significant progress to warrant more time.  We affirm.

On December 1, 2020, the Arkansas Department of Human Services (DHS) filed a petition for emergency custody and dependency-neglect of the parties' children.[5]  In the attached affidavit, family-service worker (FSW) Sarah B. Hagerman stated that she received a message from the Perry County Sheriff's Office (PCSO)on November 25, 2020, stating that they had five juveniles in custody and needed to speak to her.  Shanna had filed an ex parte order of protection against Christopher, the noncustodial legal parent, on behalf of the children that day, and she was named the children's temporary guardian.  The children had lived with Christopher for almost a year before the order of protection was filed.  The children were angry and crying and informed the PCSO that they did not want to be with Shanna.  The older children said that they were afraid that she did not have an appropriate home for them and opined that she was not an appropriate caregiver, having had only minimal contact with the children for almost a year.  Additionally, the four-year-old stated that they did not want to go with Shanna because they "[didn't] want to have to suck a 'tally whacker.'"  Shanna arrived to get the children without appropriate transportation or car seats.  She was informed that she needed those things to take the children into her custody.  Shanna began looking for a ride and informed the PCSO that she would be waiting to be

_____

[5]Another female, born December 17, 2004, was included in the petition.  However, she had reached the age of majority by the time of the termination of appellants' parental rights.

2

contacted at home. No phone number was given to the PCSO, but a residence was listed in the ex parte order. FSW Hagerman was instructed to access the residence and to drug screen Shanna. However, when she arrived at the listed residence, she could not enter the yard due to an aggressive pit bull. She attempted to contact someone at the front and back gates, she honked the horn, and she walked the perimeter and called out to any possible occupants but was unable to contact anyone. There were no lights on at the residence and no cars were present. FSW Hagerman left the residence and went to the PCSO and spoke with the children, who confirmed that they were afraid to stay with Shanna and that they did not think Shanna's residence or the people she kept company with were safe. Since Shanna could not be contacted, the children were placed in the provisional custody of their adult sister, Tori Stocks, in Pangburn, Arkansas. A second hold was placed on the children on November 30 because the pleadings had not been filed in a timely manner. The circuit court entered an ex parte order for emergency custody the same day the petition was filed. It found probable cause to believe that the children were dependent-neglected and that it was contrary to the welfare of the children to remain with appellants. The circuit court appointed an attorney ad litem to represent the children and separate attorneys to represent appellants.

An amended petition for ex parte emergency custody and dependency-neglect along with a supporting affidavit were filed on December 17. It added Shawn Ashcraft as the mother of Shanna and MC5; however, Shanna was the legal custodian of MC5. According to the affidavit, DHS was able to contact Shanna at her residence. Shanna allowed the workers to complete a walk-through of the residence. It was noted that the residence was

being remodeled and that there were no beds in the children's room. Shanna submitted to a drug screen and tested positive for amphetamines and methamphetamine. Shanna denied using methamphetamine but said that she had been around someone using drugs. Shanna subsequently admitted "slipping up" and informed the workers that she needed help. She said that she had completed outpatient treatment before when she had an open case in Faulkner County. She stated that she had been stressed about everything that was going on with the children and that she made a mistake by using illegal drugs. The workers went over with Shanna all the issues in the home that needed to be corrected.

A probable-cause order was entered on December 31, finding that probable cause existed and continued to exist requiring that the children remain in DHS's custody. The children were adjudicated dependent-neglected in an order filed on February 4, 2021. The order noted that the parties stipulated—and the circuit court found—that the children were dependent-neglected due to neglect and parental unfitness of Shanna due in large part to drug exposure and usage. Christopher was found unfit to take custody because there was a no-contact order in place between him and the children, and a home study and background checks and drug screens were needed on the people in his home. The goal of the case was set as reunification. Appellants were ordered to participate in services; complete parenting classes; obtain and maintain stable, appropriate housing and employment; and submit to a home study once a permanent, stable residence has been identified.

In the May 10 review order, the circuit court found that the children were placed together and were doing well. The circuit court found that Shanna had been inconsistent

4

with her visits with the children, but when she did visit, the children were excited to see her. The order noted that Shanna stormed out of the March 12 visit, refused a drug screen, and called the caseworker a liar and said that she did not want to see the caseworker again. She was ordered to provide "a 24-hour notice if she [was] going to attend visits." Shanna was found to be in partial compliance: she had completed her psychological evaluation, but she had not gotten into counseling, she had not done her hair-follicle test, she had not complied with drug screens, she had missed several visits, and she had not "done parenting" classes. Christopher was found in substantial compliance; however, he had not completed a hair-shaft test and had not visited the children due to the no-contact order.

A second review order was filed on September 29. The circuit court noted that Shanna was in rehabilitation in Conway and that this was her third time entering rehab. Shanna was found to be in compliance, and the circuit court stated that she would finish counseling and parenting classes once she finishes rehab. The circuit court stated that the only problem DHS had with Shanna was getting her to submit to drug screens. The order stated that the children were placed together in a licensed foster home.[6]

The circuit court held a permanency-planning hearing (PPH) on November 28. In the order filed on December 6, the circuit court found that the case goal should be reunification with a concurrent goal of placement with a fit and willing relative. Shanna was found to be in compliance and had made significant and measurable progress. Her sobriety

---

[6]The children's sister had become licensed by this time.

date was noted as September 9. The circuit court found that Shanna still needed to complete parenting classes, attend counseling, submit to a hair-shaft test, remain drug-free, and make her home available for assessment for appropriateness. Shanna's visitation with the children was moved to unsupervised day visits. Christopher was also found to be in compliance, although he needed to complete parenting classes, submit to a hair-shaft test, attend counseling, and remain drug-free.

The circuit court held a fifteen-month review hearing on February 11, 2022. In the order filed on May 24, the circuit court noted that the children could not be returned to Shanna's custody because her sobriety needed to be confirmed, and the circuit court needed to see background checks and drug screens of the people in her home. The children could not be placed with Christopher because he acknowledged methamphetamine use in December, and his sobriety was also in question. The circuit court ordered DHS not to file a petition for the termination of parental rights because the children were being cared for by a relative who had made a long-term commitment to them. Shanna was found to be in compliance with the case plan; Christopher was found to be minimally compliant. Shanna was to have no visitation with the children in her home until she tested clean on a hair-shaft drug test, the other residents had submitted to drug tests, the background checks of the other residents were received, and no health and safety concerns were found. The order noted that Christopher had begun visiting with the children after Shanna signed the necessary documents to allow him to visit with them.

A third review order was entered on July 28. The circuit court came up with a plan for Shanna's visits with the children to progress to a trial home placement. Christopher was allowed to continue supervised visits with the children for at least four hours a week. Shanna was found to be compliant; Christopher was partially compliant. Shanna still needed to complete parenting classes and individual counseling and to remain drug-free.

A second PPH hearing was held on November 3. In the order filed on February 6, 2023, the circuit court noted that the case had been open for almost two years and that neither parent had made significant and measurable progress. The case goal was changed to termination of parental rights and adoption. The order stated in pertinent part:

6. The mother, Shanna Moon, has not met her burden to show significant and measurable progress. Specifically, while Ms. Moon had progressed to the point a trial home placement had begun, Ms. Moon was subsequently arrested, placed in jail, and currently has pending forgery charges. This required the trial home placement to be halted due to inadequate supervision, and drug screens conducted on the juveniles confirmed that they had been exposed to methamphetamines. Additionally, Ms. Moon has not sufficiently satisfied her own sobriety. This Court ordered Ms. Moon to submit to continued drug screens, and while she has had two negative hair follicle tests, she has been unable to provide a urine sample for other required drug screens, and thus the only verification of Ms. Moon's sobriety is her word. Ms. Moon states that she does not know how the juveniles were exposed to methamphetamines, does not know why the trial home placement ended, and has not been to the Perry County DHS office to inquire why, or utilized her appointed counsel to obtain an answer.

7. The father, Mr. Moon, has likewise been unable to establish his sobriety to the satisfaction of this Court. Mr. Moon was required by this Court to undergo drug screens, and in fact had positive drug screens past his stated sobriety date. Mr. Moon has not had contact with his children since the end of July. He states that he has not been able to reach Ms. Trippet with Arkansas Department of Human Services to arrange visitation, but the evidence established that he has not been to the Perry County DHS office to get answers to his questions about visitation, nor has he utilized his appointed counsel to advocate for him.

7

Shanna was to have supervised visits with the children. Christopher was granted unsupervised visits with the children.

DHS filed a petition to terminate appellants' parental rights on February 8, 2023, alleging twelve months failure to remedy,[7] subsequent other factors,[8] and aggravated circumstances.[9]

The termination hearing was scheduled to take place on April 6. However, at the beginning of the hearing, Christopher's attorney moved for a short continuance due to problems with the Perry County eFlex system. The hearing was continued to April 11. Shanna testified that MC1, MC2, MC3, and MC4 are her children and that they have been in DHS's custody since November 25, 2020. She denied knowing why the children were removed or adjudicated dependent-neglected. She admitted that she had a trial home placement with the children that ended when she was arrested. She acknowledged that the children tested positive for drugs after the trial placement but denied knowing why they did so other than saying someone at the house must have been doing drugs. She said that her initial sobriety date was September 10 but that the new date is February 7. She stated that she had just celebrated her sixty days of sobriety. She testified that she currently lived at The Jodi Bruce House (JBH), a chemical-free living facility in Texarkana, Texas, which she chose

---

[7]Ark. Code Ann. § 9-27-341(b)(3)(B)(i)*(a)* (Supp. 2023).

[8]Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)*(a).*

[9]Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)*(a)(3)(B).*

to go to on her own. She said that she completed thirty days of inpatient rehab at the Ouachita Chemical Dependency Unit (CDU) in Camden. She said that JBH is a ninety-day rehab, but one could choose to stay longer. She testified that she has a job, attends two AA meetings daily, joined an AA group, has a sponsor, and is currently working the steps from the beginning because she wants to learn to live a sober life instead of a drug-filled one. She said that children are not allowed to live at JBH. She stated that after her ninety days, she plans to find a place possibly in Conway and to continue to work the program. She said that she will also relocate her job to Conway. She admitted that she did not currently have a stable and appropriate residence for the children, but she said that she is working on it. She testified that she would need about fifty-two more days before she could get a place and get custody of her children.

Shanna testified on cross-examination by the ad litem that her children would have to wait fifty-two or fifty-three more days before she would be ready to get them back. She agreed that if they waited the additional days, they would be in DHS's custody for thirty months. She said that it was someone else's fault that the children tested positive for methamphetamine following the trial placement. She said that she relapsed in September 2022, right before her one-year anniversary of being sober. She stated that she relapsed when she learned that she was at risk of having her parental rights terminated. She admitted that she still had three or four parenting classes left but said that she had not completed the classes over the course of the case because she did not have a car, and after she got the children back on the trial basis, she just did not go to the classes as she should have. She

9

said that the children lived with her for three or four months before they were removed. She admitted that the home was not in good condition when the children were there. She testified that she was once clean for nine years before relapsing. She admitted using illegal substances the first year after the children had been taken into DHS custody. She said that sometimes she lied about her drug usage and sometimes she would tell the truth. She relapsed after being sober for almost a year. She said that she would not relapse again because she has furthered her recovery and is actively working the steps. She also stated that she has a sponsor, which she did to have the last time, and that she attends meetings like she is supposed to. She testified that she "love[s] being sober" and that her life is now how it was when she was sober for nine years. She said that she was arrested for an old warrant and lied to police because she did not want to go to jail.

On cross-examination by her attorney, Shanna stated that her first sobriety date is September 10, 2021. She said that she was on step four at the facility in Camden, but she started back at step one when she got to JBH. She testified that eight other women live in JBH and that they pay rent. She said that she has been employed for about three weeks as a prep cook at Chili's. She stated that she is required to attend only one AA meeting a day, but she goes to two. She said that she has been at JBH since March 3 and that she passed her random drug test. She testified that she went to JBH after the rehab in Camden because she wanted to further her treatment and do more than just the thirty days because she understood that she has an addiction, and it is something she will battle the rest of her life. She compared her addiction to a disease and said that AA is her medicine. She said that she

actively participates in the meetings and will be chairing her first meeting on Saturday. She stated that she wanted to move to Conway because she really does not know anyone there anymore. She said that if she gets bad news or is otherwise feeling stressed, she will call her sponsor or talk to someone about it. She stated that she has a lot of supporters, not just her sponsor. She said that she has distanced herself from her family and former friends. She stated that she has put in applications at a couple of apartments in Conway and that she is going above and beyond trying to make her life better so she can be a good mom to her children. She said that getting sober was her main concern.

On cross-examination by Christopher's attorney, Shanna denied that the children were initially removed from her custody. She said that they went into DHS's custody after they were taken from Christopher. She testified that she has had her sponsor for about three weeks, and they talk several times a day. She stated that her prior sponsor of about two weeks relapsed, causing her to find a new sponsor. She reiterated that she is currently on step one.

Christopher testified that he is the father of MC1, MC2, MC3, and MC4. He stated that his sobriety date is July 8, 2022. He admitted that he did not submit to a drug screen because DHS had not contacted his attorney about performing one on him. He said that he did not visit with the children the entire month of March because he did not have transportation and he was working on a property, trying to get ready for court. He admitted that he has contacted DHS for transportation in the past, but he failed to do so in March.

On cross-examination by the ad litem, Christopher testified that he tried to volunteer clean drug screens but was always refused. He stated that he did not bring any witnesses or

11

documentation that he has been attending NA meetings. He said that the house on Lily Street in Houston, Arkansas, is ready for the children, he only has to put up bunk beds. He admitted that he was just now communicating that the house is ready to be checked out at the hearing. He stated that he last used drugs in July 2022.

On cross-examination by his attorney, Christopher stated that the children were in Shanna's custody when the case first opened. He said that he lost two homes due to fires during the pendency of this case. He testified that the children are happy during his visits with them, but they seem sad when he leaves. He stated that he has his own landscaping business, but business has been "kind of slow through the winter." He said that he has not invited DHS out to the property because "it's still not ready." He stated that the circuit court should deny DHS's petition and allow the children to come home to him.

Toni Trippett of Perry County DHS testified that Shanna has not obtained stable and appropriate housing because she lives in JBH; she stated that Shanna's visits with the children have been inconsistent; and that DHS has been unable to conduct drug screens on Shanna—now, because she is in rehab. Trippett also stated that Shanna has not completed her parenting classes. She testified that Shanna had "at times shown improvement, but then she relapsed." She opined that the potential harm of returning the children to Shanna would be that Shanna would relapse again. Trippett testified that Shanna had not remedied the conditions that caused removal because she did not have a safe and appropriate house, and she had just recently become sober on February 7 when she entered rehab. Trippett stated that Christopher had not visited with the children, that he refused the last drug screen, and

12

he had not remained in contact with DHS. She opined that the potential harm in returning the children to Christopher would be his sobriety and his lack of initiative to do the services offered to him. She stated that Christopher had also not remedied the issues that caused removal. Trippett said that it was in the children's best interest that Shanna's and Christopher's parental rights be terminated because the children should not have to "languish in foster care any longer."

On cross-examination by the ad litem, Trippett testified that parenting classes had been referred and available to Shanna for twenty-eight months, the duration of the case. She said that although Shanna completed therapy, she had not seen evidence of any benefit that would cause her to recommend reunification with Shanna. She testified that in addition to Shanna's relapse, adequate supervision on Shanna's part was also a concern because she did not make any plans for the children when she went to jail, she allowed inappropriate people around the children, and the home was in horrible condition. She stated that Shanna's last-minute effort to obtain sobriety is not enough to continue the case's goal to reunification. She testified that she has never known Shanna to live independently and that DHS would want to see stability and independence before recommending any kind of placement with Shanna. She said that it is not in the children's best interest to have to wait on Shanna.

On cross-examination by Shanna's attorney, Trippett testified that not only would Shanna need to be sober for some period of time, but she would also have to show stability. She said that she believed Shanna was sober at the hearing and that she believed Shanna was sincere about being sober and her desire to remain that way.

13

On cross-examination by Christopher's attorney, Trippett testified that she reached out to the foster mother in the middle of March to try to facilitate Zoom calls between Christopher and the children, but the foster mother did not want to allow the calls because they were unsupervised. She stated that relative placement was no longer a viable option because the relative had asked that the children be removed. However, Trippett said that the relative is working with DHS until an adoptive home is found. She stated that it is DHS's intention to find a home willing to take all four children; however, she agreed that if such a home is not found, the children may have to be separated.

Sandra Marfoglio-Hinton, the adoption specialist, testified that on April 4, there were nine adoptive data matches for the children. She opined that the children will be adopted. On cross-examination by Shanna's attorney, she stated that there are other options in addition to data matching, including adoption events. She admitted that nine was a small number. She said that there is a better chance that the children will be adopted than not. On cross-examination by Christopher's attorney, Marfoglio-Hinton testified that she did not know how long the children would have to wait to be adopted. However, she stated that once she gets an adoption packet, children are usually adopted in between six and eight months.

Hunter Ayer testified that she manages Jodi Bruce Sober Living House where Shanna lives. She said that residents are required to work a twelve-step program (NA/AA) in order to live there. She stated that the residents are drug tested and that if Shanna had failed a

14

drug test, she would be kicked out of the home. She opined that Shanna is serious about her sobriety. She said that children are not allowed to live in the home, but they can visit.

Tracy Antonovich, Shanna's sponsor, testified that she met Shanna as soon as Shanna got out of treatment at CDU and that they have been working "pretty closely together" for about a month. She stated that she speaks to Shanna daily and that they meet face to face about three times a week. She opined that Shanna is actively engaged in the sober support system and in obtaining sobriety. She stated that Shanna shows the top three signs of being in recovery for the long haul: actively attending AA, actively getting a sponsor, and having active and frequent contact with other people in recovery. She said that she is willing to be a long-term support to Shanna.

DHS argued that the circuit court should grant its petition for termination of Shanna's and Christopher's parental rights on the grounds pled because the children should not have to wait around in foster care any longer. The ad litem agreed that the petition should be granted. Both parents asked for more time and for the petition to be dismissed.

The circuit court filed an order terminating appellants' parental rights on April 20. It stated that neither parent had provided evidence of a current, safe, and stable home; neither had consistently visited the children; neither had demonstrated sustained sobriety; and neither was fit to have custody. The circuit court granted DHS's petition on all grounds pled. It found that the children are adoptable and that there were nine potential matches willing to take them as a sibling group. As for potential harm, the circuit court found that concerns about the appellants' sobriety and stability impacted the harm the children could

15

face if placed with either of them. It noted that appellants had failed to remedy the conditions that caused removal, they failed to show evidence of their stability or sobriety, and they failed to comply with the court-ordered services or visit the children consistently. Appellants filed timely notices of appeal. This appeal followed.

This court reviews termination-of-parental-rights cases de novo.[10] Termination requires a finding of at least one statutory ground and a finding that termination is in the child's best interest.[11] Arkansas Code Annotated section 9-27-341(b)(3) requires a circuit court's order terminating parental rights to be based on clear and convincing evidence.[12] Clear and convincing evidence is that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established.[13] When the burden of proving a disputed fact is by clear and convincing evidence, the question that must be answered on appeal is whether the circuit court's finding was clearly erroneous.[14] A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made.[15] This

---

[10]*Lloyd v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 461, 655 S.W.3d 534.

[11]*Id.*

[12]*Id.*

[13]*Baker v. Ark. Dep't of Hum. Servs.*, 340 Ark. 42, 8 S.W.3d 499 (2000).

[14]*Tankersley v. Ark. Dep't of Hum. Servs.*, 2012 Ark. App. 109, 389 S.W.3d 96.

[15]*Id.*

court gives a high level of deference to the circuit court because it is in a far superior position to observe the parties before it and to judge the credibility of the witnesses and the weight of the evidence.[16]

Appellants do not challenge the circuit court's finding of statutory grounds for termination; thus, any such challenge is waived.[17] Appellants also fail to address the circuit court's findings regarding adoptability within its best-interest analysis. Therefore, we need not address those findings either.[18] Christopher also fails to address the circuit court's potential-harm findings, which amounts to a waiver of that issue as it relates to him.[19]

Both Shanna and Christopher contend that the circuit court erred when it failed to consider the impact termination would have on the sibling relationship. DHS argues, and we agree, that this issue is not preserved for appeal. Appellants failed to raise a sibling-separation argument to the circuit court.[20] But even if the argument was preserved, it would fail for two reasons. First, there was no evidence of a genuine sibling bond, despite appellants' contentions otherwise. Arkansas appellate courts have consistently held that

---

[16]Barnett v. Ark. Dep't of Hum. Servs., 2023 Ark. App. 481.

[17]*Alexander v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 536, ___ S.W.3d ___.

[18]*Id.*

[19]*Id.*

[20]To the extent that Christopher asks this court to overrule our precedent, we decline to do so.

17

sibling-separation arguments will not support reversal absent some evidence of a genuine sibling bond, which was not demonstrated in the record here.[21] Second, DHS testified that it was its intention to place the children up for adoption as a sibling group and that nine potential matches had been identified. This court has recently held that when it is expected that the relationship between siblings will continue after termination, then the circuit court's best-interest finding is not clearly erroneous based on severance of the sibling relationship.[22] Additionally, there is no requirement that siblings be adopted together.[23] This court has held that keeping siblings together is an important consideration but is not outcome determinative because the best interest of each child is the polestar.[24]

In addition to the above argument, Shanna challenges the circuit court's potential-harm finding. She argues that the law does not require flawless compliance. The circuit court is not required to find that actual harm would result or to affirmatively identify a potential harm.[25] Potential harm must be viewed in broad terms, and potential necessarily means that the court is required to look to future possibilities. Here, at the time of the hearing, appellant had not found or maintained stable housing, she still struggled with

---

[21]*Waldon v. Youngblood*, 2023 Ark. App. 353.

[22]*Alexander, supra.*

[23]*See Nichols v. Ark. Dep't of Hum. Servs.*, 2021 Ark. App. 420, 636 S.W.3d 114.

[24]*Price v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 140.

[25]*Ross v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 503, 529 S.W.3d 692.

sobriety, and she failed to complete parenting classes, even though she had twenty-eight months to do so. This court has held that instability and continued drug use demonstrates potential harm sufficient to support a best-interest finding in a termination-of-parental-rights case.[26] A parent's failure to comply with court orders itself is sufficient evidence of potential harm.[27] Additionally, evidence that supports the statutory grounds may also support a potential-harm finding.[28]

Shanna also contends that she made significant progress to warrant more time. A child's need for permanency and stability may override a parent's request for more time to improve the parent's circumstances.[29] Here, the children had been out of the home and in DHS's custody for over two years; yet Shanna had done practically nothing until the last minute to achieve reunification. She did not obtain employment until just before the termination hearing. She still did not have housing for the children. She never completed parenting classes. Although she had advanced to having a trial placement of the children, they had to be removed when she was arrested on an outstanding warrant. She never appreciated why the children were initially put in DHS's custody or took responsibility for it. And she waited until the eleventh hour to seek help for her drug addiction. Shanna had

---

[26]*Jordan v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 344, 652 S.W.3d 611.

[27]*Blasingame v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 342, 582 S.W.3d 873.

[28]*Minchew v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 95, 660 S.W.3d 909.

[29]*Rylie v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 366, 554 S.W.3d 275.

ample time to prove she could parent the children during the pendency of the proceedings—she did not do so. The children's need for permanency outweighs Shanna's request for additional time. Shanna's argument is nothing more than a request for us to reweigh the evidence in her favor, which we will not do.[30]

Affirmed.

VIRDEN and GRUBER, JJ., agree.

*Tabitha McNulty*, Arkansas Commission for Parent Counsel, for separate appellant Shanna Moon.

*Brett D. Watson, Attorney at Law, PLLC*, by: *Brett D. Watson*, for separate appellant Christopher Moon.

*Kaylee Wedgeworth*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor children.

---

[30]*Snider v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 502, 612 S.W.3d 199.